Good morning. We're prepared to hear argument in PPL EnergyPlus v. Nazarian. Mr. Strauss. Good morning, Your Honor. May it please the Court. I'm here for the appellant, the Maryland Public Service Commission, and I wish to reserve three minutes for rebuttal. Your Honor, this case concerns Maryland's effort to meet an obligation that all states owe to their citizens, the obligation to ensure that the lights stay on, now and in the future. Maryland conducted an investigation, determined that the state was facing electric reliability risks, and decided to take action before rather than after a crisis. Maryland responded by seeking competitive bids for a new power plant that would be built in the area most at risk. CPV responded to Maryland's RFP. Maryland found CPV's bid to be most cost-effective for ratepayers and, consistent with state law, directed its retail utilities to sign long-term agreements with CPV. Assuming the contract with CPV is FERC jurisdictional, Maryland did not intrude on FERC's rate review jurisdiction by directing its utilities to sign agreements that are subject to that jurisdiction. And Maryland has no control over which resources clear a federal auction. CPV must bid in compliance with all auction rules, including those adopted by FERC, to govern the participation of state-sponsored resources. CPV did so, and it cleared on that basis. Now, Apelli's claim that CPV's participation interfered with the auction, but FERC found the auction results just and reasonable and deemed CPV's resource economic, competitive, and needed, notwithstanding the state's support. Now, contrary to Apelli's claims of financial harm Did FERC actually address the state support portion of this scheme? They addressed the use of resources. They addressed the issue of resources bidding into the auction having state support, state subsidies, and concluded that if the resource cleared in accordance with FERC's rules on a cost basis, notwithstanding the subsidy, that they were needed, competitive, and economic, and that they did not artificially That was just a general matter. I'm asking with respect to this case. Did they opine on that issue? They did not opine on this specific contract, but they certainly had the details of this contract in front of them in a series of cases. Remember how this went down. Originally, under the original MOPR, the first Minimum Offer Price Rule, which FERC adopted at the time in 2006, states were able to bid in resources needed to address capacity shortfalls. Why did you shift from the verdict area integrated model and go into the interstate regional auction system because you knew that there were going to be certain restrictions when you made that shift in your energy generation model? Yes, Your Honor. We knew that there would be certain restrictions moving to that model, but we also knew that the states had a backstop authority to make sure that the light stayed on if the market didn't produce the needed response. And in this case, Maryland investigated carefully. Are you saying there's no way you could produce additional generating capacity without the 20-year subsidy? The state put out an RFP for competitive bids and sought a long-term contract because we wanted to make sure the resource would be in the market. 20 years is an awfully long guaranteed subsidy. A shorter subsidy would be more favorable for your case, but when you compare the 20-year subsidy with the three-year forward pricing model, there does seem to be an imbalance there trying to tilt the game board because what FERC has done is it's got a carefully balanced scheme between new entrants into the interstate market and existing entrants, and it's got a particular three-year exception for new entrants, and all of a sudden you come with a 20-year guaranteed revenue stream. Yes, Your Honor, if I could address that. The new entrant pricing model, the three years you're talking about, that's the model under the RPM auction. But FERC never said that the only way resources could be built was through the auction. As Judge Garbus found, parties can meet their obligations in the auctions any of three ways. They can build their own plant, they can buy the capacity bilaterally, or they can buy through the auction. So parties are free to contract. There is a separate marketplace outside the auction, a bilateral marketplace to try to get plants built. Now, all resources that you build and you want to use to meet your obligations have to clear through the auction, and PJM will pay all resources that clear the same price. But here, remember, the CPV resource, as you just noted. But you can go into the auction low because you know that you can clear the auction, and you know that you can bid low in the auction because you know you're going to have the difference made up. No, you can't, because as a new resource, when you bid into the auction, you have to bid on a cost basis. In this case, what happened is PJM set CPV's bid on a cost basis, and it cleared on that basis. Now, once it does clear, as with any resource that clears on a cost basis, you can bid as a price taker thereafter. Indeed, most of the resources did. As Judge Garbus found, 80% of the participants in the auction bid on a zero or price taker basis. There's nothing unusual about what the CPV resource is doing. They don't have an incentive that's any different than any other resource in the auction. So FERC's power with respect to the interstate market is the power to set rates. And amidst all of the different briefs and everything, all the discussion here, there's one question that occurs to me, and that is, how can this not set the rate that CPV receives when there's a guaranteed, through these contracts for differences, it's guaranteed to them that they will receive a rate that makes up the difference between any revenue they receive at auction, and Maryland's got a set of, they're saying what they should receive as a return. And they're entering the market knowing that whatever they receive at auction, the difference is going to be made up between what Maryland thinks they are going to receive with this 20-year subsidy, work through coercing local electrical distributors to make up the difference. Now, how does that not set the rate that CPV receives? Let me address that question. As concerns the Federal Power Act, there are two points to remember. One is public utilities set rates as an initial matter, and FERC gets the right to review them. CPV bid into the RFP, and Maryland accepted their bid. CPV's bid and the subsequent contract with the retail utilities sets a rate that may be a rate subject to FERC's jurisdiction. This court finds it FERC jurisdictional. FERC can go ahead and review that rate. If FERC finds that it offends some rate uniformity principle or some other principle, FERC can reject the rate or modify the rate. But there is no preemption. Either the contracts are non-jurisdictional and operate outside the Federal market, or they're subject to FERC jurisdiction. But as to the question before this court, whether they're preempted, the answer in either case is no. All right. Thank you. Thank you. Mr. Elgart. Thank you. I represent CPV. We were the winning bidder. We're currently building a power plant in Charles County. Let me just ask you a question. How are other plants expected to compete with you that may be more efficient and everything? But if you have a 20-year guaranteed revenue stream, how are other plants expected? How can they compete in the interstate market with you when you have this kind of guaranteed advantage? Doesn't it just skew the market significantly? No, it does not, Your Honor, because the way – well, two reasons. One is the very purpose of providing a subsidy over 20 years to build particular generation capacity in a particular location using a particular technology and guaranteeing we will continue to be online for 20 years was the very objective. So, of course, there is a subsidy, and a subsidy does provide an advantage for new construction. But for the sale of capacity – and other things such as that rather than something like this. Yes, there are many ways to provide subsidies, but if you think about it, you'll realize this particular form of subsidy is actually the most economically adroit. In other words, the capacity is sold. That's not the issue as to whether it's economically adroit. The issue is whether you have a preemption problem by tying the subsidy to the rate. Of course that's correct. And so when you do that, why don't you have a problem irrespective of how efficient it might be or otherwise? So the two questions then are the field preemption question. Turning from the question that Judge Wilkinson asked me, which is how the competitive market functions, the auction process functions independently, and we must participate in the auction according to the FERC rules. So the competitive market, as determined by FERC, and yes, FERC determined in three rulings, with these specific subsidies in front of it, as reflected in the recent Third Circuit decision in NJBPU, but also in three decisions all included in the appendix. FERC, with these specific rules in front of it, said the market, the competitive market, the way the auction runs, functions fine. So that's conflict preemption. I'm really afraid that we're going to mess this whole system up. If we affirm here we could do so on a narrow ground, which said the 20-year guaranteed revenue stream is just too much, too antithetical, and we don't need to reach other things that the state might do. But if we reverse and uphold something like this, it provides a broad umbrella for all kinds of subsidies here, there, which effectively set rates. And we could be doing some incredible damage. Not true. And the reason you can't do damage is because FERC has plenary authority over all of these issues. FERC determines when the auction is not functioning. And FERC reacted specifically to these rates. And it determined that because of the importance of subsidies, the state should be allowed, and this is exactly what NJBPU held, the states must be allowed to support new generation. Meanwhile, FERC itself is looking out for exactly what this court just said and making sure that there is no adverse effect on the auction. Remember, the auction is only a residual market. The main contracting market takes place usually with 20-year contracts in a bilateral way. So the length is not the issue. Now, FERC has not necessarily spoken in this case, but your opponents have attempted to expand the record by including a brief in a different case where apparently it did voice a concern about this particular scheme. Yes. And I have something to say about FERC's brief in that case, which is FERC did not support the notion that these are rates or charges. They did not say a third-party payment is a rate of charges. What they said is it affects the rates. Of course it does. So when you ask the federal government how broad is their power, it is as big as the ocean and as high as the universe. But their proposition was not in support of the notion that these are rates and charges, but rather it affects rates or charges. And the effect issue is not a yield preemption issue under Northwest Central. That's a clear holding of the Supreme Court. Those go under 205 and 206. And as to the conflict, if there is a suggestion of conflict, we point to FERC's orders rather than its commentary in a brief. Orders are subject to APA review, and those orders are the ones we've cited. 135 FERC, and the specific paragraphs are mentioned. 135 FERC at paragraph 175 deals with this. 137 FERC at paragraphs 130, 133. Are those decisions broadly supportive of FERC's exclusive regulatory power in this whole field of interstate electricity sales? I mean, you read the Supreme Court opinions, and they seem pretty supportive of what of FERC's exclusive powers. And doesn't that begin to suggest field preemption to you? No, Your Honor, only because Northwest Central really defines the lines between the two. And it says there are actually two lines of authority here. But what was at issue in Northwest Central? Wasn't it the timing? No, but the issue was, the argument, the legal argument was, if something affects in an important way the rate being set by FERC, would that be field preempted? Then they went on to conflict preemption and said, again, you have to judge conflict preemption in terms of the fact there's going to be a necessary interplay between the two schemes, which is the state's power to create new generation capacity is as important to the national interest as anything that FERC does. Because if you don't have electricity. As Judge Keenan was suggesting earlier, whether this is important to the national interest and whether this is a good idea or a bad idea, it may be a wonderful idea for all I know. But the discreet legal question before us is, does it essentially set a rate? And when you guarantee a revenue stream that allows a CPV, your client, to come in at a very low price with the knowledge that the difference is going to be made up in terms of the rate that CPV ultimately receives, whether that's a good idea or a bad idea is beyond my pay grade. But we do have, I don't see how this doesn't boil down to the simple question of the combined revenue that CPV receives from the auction and from these contracts for difference. And the fact that the local electrical companies are going to make up the difference. Why doesn't that set the rate? It determines what CPV receives from interstate electricity sales. It sets the rate, doesn't it? No, that is not the rate. The rate is defined as the amount that is exchanged in the sale, which is covered under section 201. It affects the rate under section 205 and 206. It is not for the sale. It is an outside the market supplemental payment. Yes, it is important. But then it falls within FERC's jurisdiction to determine. And FERC has said over and over again, and we cited the Allegheny case on the one side and the Midwest Power case on the other side of the equation, that when the state chooses to procure, direct its EDCs to procure capacity in the long term, it is acting within the power of the state. So long as the price, your CPV's price, was set by the market. So my point is, in response to Judge Keenan, that the Supreme Court has defined and FERC's own cases define a clear line, and that's what they call it, a clear line between the narrow power, which is the rate power, of which FERC can take jurisdiction and supervise it at any time. It could say, I don't like this, or not. Thank you. You've got some time for rebuttal as well. Thank you. Mr. Clement. Good morning, honors, and may it please the court. Paul Clement for the appellees. There are some preemption cases that come before this court where the state has sort of stumbled into a preemption problem or into a federal field. But that's not this case. This is a case where the state knew in 1999 that it was making a conscious decision to move away from a vertically integrated model, where they would control the generation power soup to nuts, and affirmatively went to a model where they would be reliant on the interstate market. When they did that, they knew there were going to be some advantages, namely lower rates, and that there were going to be some – What's the advantage they received from going to the interstate market? They received lower rates. They received more efficient service. They received the benefit of all of the FERC regulation. But it's not like when they went into that wholesale market, they didn't understand that FERC would be the one principally regulating that. Indeed, at that time, they specifically said, well, we understand by going away from the vertically integrated model, we're going to lose some control that we traditionally had. But in that respect, they made a conscious decision. Then, as the years went by, that was a decision they made in 1999, they didn't like some aspects of the way that things were working out. So they did what you would expect a state to do when you've made a decision to go into a federally regulated market, which is they went to the federal regulators. They went to FERC, and they said, we don't think this is working out that great. We don't think that your current model, which basically gives a three-year cost recovery assumption, that's kind of the underlying assumption of the model, because it allows somebody to bid for capacity three years in the future on the assumption you're going to make up that money in three years. They said, we don't think that gives enough confidence to investors to actually put money, and we think that's part of the reason we're not seeing new generation facilities being built in Maryland. And the state is saying here, we're not setting a rate, we're simply incentivizing and funding construction of new generating capacity. What do you say to the respondents to that? Well, Your Honor, I'd say that both ends and means are important. And the fact that their end may be, we're trying to get new construction projects in Maryland, doesn't mean that the means aren't critical and important. And the means by which they're trying to do that is by setting a rate for wholesale energy transactions. And that's something that they just can't do under the federal regime. Do they actually set the rate here, or is this a scheme that simply has an indirect impact on rates? They set the rate about as directly as any case you're going to see, Your Honor. How so? Because, as you yourself indicated, they determine through state action what CPV is going to receive for sales on the wholesale market. And when confronted with that question, my friend on the other side, really their only response, the only response they could have is, well, no, because we have essentially two payment streams for these sales. We have the direct payment that we receive from PJM for our direct sales, and then the difference is made up by what, under state law, the EDCs are forced to pay us. Now, I have a couple of comments. So you're saying you're still setting a rate even if the revenue comes from two different sources? I'm saying that, and if I didn't have any text to rely on, I'd still say that was right as a matter of just common sense, that a rate is what you receive. But, of course, we are guided here by the text of the Federal Power Act, and it specifically talks in defining, and when it talks about rates, it specifically talks about what someone receives for the provision of energy or the provision of related services. But what if CCD here had instead received a tax break or subsidy directly from Maryland? That would presumably have an impact on the rate. Is that problematic? It might be problematic depending how the subsidy was set up, but it wouldn't be problematic in the same obvious way that this is. And I would quite agree. This is just too blatant as a problem. Well, it's blatant both in how it operates, and it is blatant in the sense that it blatantly operates to set a rate. And I quite agree with Judge Wilkinson's suggestion that the proper course here is to decide this case narrowly. And we think in some respects, although you often think of field preemption as the broad way to decide a case, I think actually the field that is preempted here is relatively narrow. It's setting rates. Well, it's narrow because it preempts only to the extent that state action sets rates. Exactly, exactly. And it really is a narrow field in that respect. Isn't there a conflict preemption problem between the three years and the 20 years? We certainly do think there is that, and we think that's a wholly independent ground for supporting the judgment below. But the district court didn't make findings on conflict preemption. He did not make findings, but I don't, with all due respect, think that there are any findings that are necessary to support the conflict preemption judgment. Because I would say there's one finding here before I move on to conflict preemption that I think is critical, which is the district court did, after a six-day trial, look at this and entertain the idea that somehow the money that CPB is receiving from the EDCs is different from or separate from the money they're receiving on the PJM. And the district court said, no, I'm not buying that. The fact that you are receiving money from two different people under this scheme doesn't make any difference. You are still determining what they receive. You are still setting a rate. Let me ask you this. The states and the amicus briefs and the rest are saying we've got to provide sufficient electrical capacity for our citizens. We've got to assure them of an adequate supply of electricity. If you say that this is illegitimate and it's field preempted, then there really are not a whole lot of options that remain to us in terms of just making sure that our citizens receive a reliable source of electrical supply. Now, are we cutting out? Because the states do have some authority in this area in terms of construction, siding, and other matters. But what do we leave, if we accept your view, what do we leave open to the states in terms of meeting the needs of their citizens in the PJM region? Well, I think there are a number of options that would still be open. As Judge Diaz suggested, there would be ways for the state to give a direct subsidy. And if it really is a direct subsidy, I think there would be an independent problem if, like this. What kind of direct subsidy are you talking about? Just write a check, say we want you to have, you know, we don't think the market's working. We want to plant here, so we're going to give you $100 per megawatt in a state subsidy. It's going to come right out of general treasury revenues. It's not going to be contingent on you bidding and clearing into the federal auctions. I'm sorry, you go ahead. What makes this particularly insidious, for example, in a way that the direct subsidy is not? Well, two things, Your Honor. I mean, one is it's insidious as a legal matter because it sets a rate. But it is insidious as a practical matter because it's tied so directly to the federal auction. And I think that's why the bidding clear requirement is something that FERC focused on in its Third Circuit brief. Because FERC did not come into the Third Circuit and say we want to have everything preempted that affects the rate. It said the test is what directly affects the rate. Now, you may have some questions in the long run about how easy it is to police the line between direct and indirect effects. But when a state law says, look, we're only going to give you money if you bid and clear into the federal auction, that's about as direct a tying as you're going to get. And then it really does, I think in that respect, you could have a state could build a plant and say, look, we're going to still be partially in the federal auction and the federal wholesale markets, but we're going to, for purposes of this plant, we're going to build this plant with subsidies and we're going to have it supply some of our folks or there are other alternatives as well. I'm just saying there are a number of different ways the state could go about this. But when they say, look, we're not going to really pull out of the federal auction. We're going to build a generation facility. And the only thing it's going to do is sell in the wholesale market. So that is, you know, I mean, just to take a step back, when Congress reserved to the states the ability to handle generation back in the Federal Power Act in the 1930s, it could not have conceived of a state building a plant for the sole purpose of selling into an interstate market. So I do think in that respect, to do that, there are still ways they can do that. But when they build a plant exclusively to sell into an interstate market, tie it to that interstate market, and then distort that market, because what that whole market is trying to do, in addition to provide capacity, is to provide pricing signals to the market where they can efficiently build new signals. And the consequence of this being built with a 20-year subsidy in Maryland is not innocuous. It's that some plant is not going to be built in Delaware or Pennsylvania that's actually a more efficient plant. And I think that's why. Because they can't compete. Because they can't compete, and they're not, you know, again, the whole federal market is operating under the idea that the right time horizon is three years. So for somebody to come in and say, never mind three years, we're going to guarantee your rate stream for 20 years, that plant's going to get built, and it's going to get built irrespective of the fact that there might have been a more efficient place to build that plant from the perspective of the federal regulators. And, of course, the federal regulators are concerned about all of the PJM. They're not focused parochially at Maryland. All right. Mr. Clement, with respect to that, if this is, in fact, as insidious as you say it is, why hasn't the PERC weighed in with respect to this issue? Well, they have weighed in in the Third Circuit. And footnote three of that amicus brief says that essentially the New Jersey. Well, that's the Third Circuit. This is this case. Why haven't they said something about this case? Well, in the Third Circuit, they didn't weigh in until they were specifically asked by the Third Circuit. And I think what you can infer from that is that the federal regulators are not anxious to offer their views on these things, and, you know, you could have your theories as to why that's the case. But they did provide their views when they were asked, and their views were unambiguous, that these statutes are preempted and they interfere with the operation of the federal regime. Well, it goes further than that. I mean, your opponents say that not only have they been silent, but they've actually tacitly and perhaps expressly approved this very scheme. Well, I want to address that. But, I mean, you know, that's a hard argument to make after that Third Circuit brief is filed, with all due respect to them. And here's the problem with their argument that don't worry, FERC has already taken care of this. The FERC has tried to take care of this with the MOPR, but it's tried to take care of it within the confines of its own modeling. And with all due respect, it's not a full response precisely because of the difference between three years and 20 years. The way FERC does this is they only apply a screen the first year. And if you clear the screen based on your costs in the first year, then after that you are free to bid in at zero. Now, that makes some sense in FERC's world because with the three-year time horizon, their view is if you're efficient in year one, you should be billed. But that doesn't work with the 20-year guaranteed time horizon. And in a sense, I think it's CPB's own allegations in this case make this clear. They are on record at least before the trial court as saying this plant doesn't get built without this 20-year subsidy. This is the but-for cause of this plant existing is this subsidy. And so I don't see how they can turn around and say, don't worry, we're not going to have the distortive effect on the federal auction when this capacity is going to exist that would not exist at all given the price signals in the federal market. And especially given the fact that you have this three-year, 20-year disconnect, make no mistake about it. What you're going to get with this project if it goes forward is 19 years of zeros. I mean, after they clear the MOPR in the first year, they would be crazy not to bid zero because they don't get a penny, including from the EDCs, if they don't clear the federal auction. Well, this isn't a static process. I suppose the FERC could respond to that result. They could, Your Honor, but my point would be that in a sense, asking them to continually try to stay one step ahead of the states and try to further modify the MOPRs, I mean, I'm not really sure there's a good way for them to deal with this three-year, 20-year disconnect in the context of the MOPRs. Maybe they could further tweak their system, but that sure sounds to me like evidence of a conflict preemption. I mean, generally we don't say, especially when states go into a federal field like interstate rate setting, we don't say, well, we'll just let the federal regulators see if they can sort of sort that out and try to hold themselves harmless from the effect of these state laws. The way we normally proceed is to say, no, I mean, that's not FERC's job. I mean, you can also go into district court and you can get a state law that is ultra-virus because it's preempted. You can get that law invalidated so that FERC doesn't have to deal with that. That's really FERC's principal job is to try to get these interstate rates correct. That's hard enough without having to spend all of their time trying to counteract and sort of adopt new countermeasures to the latest innovation by the states, especially when those innovations are in the federal field. And that's why I do think, you know, to paraphrase the Supreme Court, albeit a dissenting opinion, this wolf comes as a wolf. I mean, this is not some subtle effort where they've tripped over some sort of obscure federal requirement. Even in the generation order that led to this plan, they said, you know, we don't like what the federal government's doing, but we think the Federal Power Act allows this. They knew they were treading on dangerous territory. That's why, you know, you don't see a lot of state generation orders that specifically address the Federal Power Act. They specifically said, we don't think that the one-year, three-year forward pricing auction is working. Now, with all due respect, they have other ways of responding to the fact that they don't like the way that the federal market is working. They tried one of them, which is to go to FERC and get them to have a longer time horizon. How is it necessary to intrude in the auction process as opposed to a direct subsidy or something? Why was it necessary to tie this so tightly to the federal regional auction? Well, I can certainly speculate, Your Honor, and what I would speculate is that there's a very good reason why they did that, because the bidding clear requirement or tying it directly is what makes this seemingly relatively obviously preempted. There is a reason why both New Jersey and Maryland did that. Now, they'll tell you it's well because we didn't want to have the rate payers pay any more than necessary. I think the more nefarious reason is that the states actually wanted these bids to be made on the federal auction, and they wanted them to be low because that would suppress the price on the federal auction. And CPV is not the only entity in Maryland. Maryland is going to be buying other energy off of these federal auctions. So if they can use this new generation facility specifically to push down the price and guarantee it gets bid in with a price-suppressive effect, then they're going to buy some of their other energy at a cheaper price and effectively get part of the subsidy paid for by power companies in other states or even principally power companies in other states like my clients. So I think what they're doing is, you know, it's not exactly something that is innocuous from an interstate perspective. It's perfectly rational from the Maryland perspective or the New Jersey perspective if we can get some of the subsidy actually paid for kind of through the back door by suppressing these rates and benefit from that with our other purchases, that's great. So I think that's why they tied it directly to it. So I don't think that's just an incidental feature of this. It's not like they committed a footfault in an arena where they otherwise had lots of ways to do this. They could do it, but it's very different to say that in the subsidy context, you know, we're going to do this and we're going to stick with our decision to have this capacity. Whether or not it clears, we really want this new facility. There are also other ways they could address this with bilateral contracts. I'm going to judge Keenan. Oh, I'm sorry. They had to have known it was a risky proposition is what you're saying, and they had to have embraced it for a reason, and that was that they were betting on the come down the line, that they could reap some of the benefits. That's exactly right. Okay. But what I understand you're saying to us here today is don't worry about any bright line rules, okay, because this is so far over the bright line. So don't even try to articulate in terms of the fact that how the subsidies are tied particularly to the rates. As I understand it, you're saying this is just so far over the line to say that it comes into the category of field preemption and not try to say exactly what else may come under the line. Yes. I think that's basically right. You know, it's not my mission to get the narrowest possible victory for my clients, but on the other hand, I do think there is a path of least resistance in this particular case, and the path of least resistance here is to really focus on the fact that whatever else is going on here, this particular state initiative set rates, and it set rates. Now, I actually think that that holding will actually, you know, I'm not sure that's going to be real easy to circumvent so that we'll just be back here with the next case just like this because, as I said, I think there's a real reason that they tied it to the federal market clearing price, and I think that that's part and parcel of why they set rates with this. You know, they really look to that price. We're going to get that price. We know we're going to get that price, but we want these guys to receive more for 20 years, so this is a simple deal. We're going to set the bottom line of what they're going to get for a wholesale transaction. We're going to set that ourselves, and then everything else is a matter of math. The particular generation order has, as I understand it, in your view, two major infirmities. One is the length of it and the duration of it, the 20-year period as opposed to the three-year period, and the other is the fact that it attempts to skew the federal auction and to get low bids on the part of CBPV in that auction, and it's tied directly into the auction. Aren't those the two major infirmities here? Yes, I think that's right. I mean, I think that, you know, as you think about it, those infirmities themselves sort of indicate further problems with what they're doing. I mean, you know, the fact that they're setting a rate, the fact that they've tied it so directly to the federal market, I mean, one of the things that is a very deliberate choice by FERC is that everybody that bids into the PJM auction gets the same price, right? I mean, they could have set this up very differently and said, look, you bid in, and whatever you bid in, as long as you're a clearing bid, you get paid just what you bid in. But instead they say, no, it's the last bid that clears. That's going to set the price for everyone. Well, just yet another way to think about the conflict here is the net result of the Maryland plan is that CPV is getting a rate for clearing this auction that nobody else is getting, and that's yet another way that there's conflict. So I don't mean to in any way disagree with what you said. I think you've captured the nub of where we think the problems are here. It's just that each one of those, if you think about it further, creates additional ways in which there is a conflict here. And the last thing I'd say is, you know, this is a case where I think as one would expect, when a state intrudes into a federal field, it's field preempted, but there's also all sorts of conflicts that are created because the reason that Congress put aside this federal field was because that was something that the federal government should regulate in the process of regulating that they make certain judgments, and the state can't really intrude on that field without upsetting it, especially when their initial motivation for going into the field is, we don't really like how this federal plan is working out. Thank you, Your Honors. Mr. Stratos, we're pleased to hear from you. Thank you, Your Honor. Let me explain for a moment again. The question before you is whether this is preempted rate setting. Under the Federal Power Act, public utilities set rates in the first instance. If a FERC jurisdictional rate was set here, it was set by CPV, bidding into the auction, Maryland accepting the bid, and directing its utilities to sign contracts. Parties set rates by contracts all the time. There's nothing unusual about it. That's how the Federal Power Act works. If this is a FERC jurisdictional contract, then it needs to be filed with FERC, and FERC can review it. If FERC finds it offends a uniformity principle of some kind, FERC can reject it or modify it. But it's not preempted, and that's the question in front of you, whether it is preempted and it's not preempted. Questions about the impact on the auction? Remember, FERC found that the auction results with the CPV resource clearing were just and reasonable. That's in the joint appendix of 1031 to 1032. They found the resource needed, competitive and economic, notwithstanding the subsidy, and that's in the joint appendix of 889 to 890. Now, the question about what the state is doing. Remember, at the time FERC approved the RPM market, they said that states could do exactly what Maryland is doing here, incentivize new resources through long-term agreements, and that is in the joint appendix at page 824. There's nothing unusual going on here. Question about bidding below cost? Remember, CPV bid into the auction in accordance with rules that FERC revised to address the participation of the resources that the state was trying to procure through these arrangements. And CPV bid at a cost set by PJM. It's not a low-cost bid. It's not a below-market bid. It's the cost bid that PJM calculated under their tariff, which is a filed rate, and it cleared on that basis. There is no auction price suppression. None of those things are going on. FERC found the results just and reasonable. It's the way the industry works. And FERC, as I said, doesn't think these kinds of contracts are insidious. Let me spend a minute again on the government's brief from the Third Circuit case. That brief says that the state statute is preempted to the extent it disrupts the wholesale market, but we know what FERC has already said about state-sponsored resources and their participation in these markets. When they participate in accordance with the revised rules, they do not disrupt the markets. That brief is simply inconsistent with FERC's orders. Remember also, in that brief, FERC does not adopt the theory that Maryland set a wholesale rate. It does not adopt the theory that Maryland offended some uniformity principle. It simply says that to the extent Maryland's activities are disrupting the auction, that's preempted. But we all know that they're not, because that's what FERC has found. In terms of bidding zero, let me explain again, as Judge Garbus found it is the case. Once you clear on a cost basis, everyone bids zero. One final point, a concern about FERC having to chase and change its rules to address these kinds of concerns, these rules were changed at the behest of the appellees who filed pleadings at FERC asking for the change. FERC didn't come out on its own and announce that the changes needed to be made. Thank you, Your Honors. We thank you, sir. Mr. O'Garden. I have to say I agree with everything Mr. Strass just said, but let me see if I can go a little more slowly because he made some major points. The first point is on the issue of whether FERC has considered this. Not only did FERC consider this in the rules reviewed in the NJBPU and approved the subsidy and say all you need to do is clear the first auction because we have specifically determined that once you clear that first auction, it is better for the auction that you continue to participate at zero. They explained why, and this is at 143, it's cited in our briefs, 211, 212. Just last year, they said sunk costs is why everybody, 80% to 97% of the bids go in zero because when you build a power plant, it's all sunk costs, and then the bids go in at zero because you'd rather get something instead of nothing. That's why people bid into the market at zero. That's how this residual auction works. It's called a residual auction for a reason because most of the contracting takes place under these long-term agreements, these very long-term agreements that take place outside of the auction. The auction is a residual auction, and whether you're in the traditional model or not in the traditional model or a bilateral contract, the way the auction works, all of that capacity, even if it's bilateral contracting, is put back into the auction and comes in at zero in exactly the same way. FERC knows that. That's why these problems reside for resolution with FERC. As to the 20-year versus the 3-year period, the exception that they talked about is this NEPA exception, which FERC has and said, we will grant, allow a subsidy of a sort for new generation in limited circumstances. That subsidy would have been paid for by the participants in the residual auction buying capacity in the auction. They said you can't impose those costs unwillingly on purchasers in the auction. That doesn't state a broad policy that extends beyond the auction. Thank you very much, sir. We'd like to come down and greet counsel, and then we will move directly into our next case.
judges: J. Harvie Wilkinson III, Barbara Milano Keenan, Albert Diaz